**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **PETROCHINA INTERNATIONAL (AMERICA), INC.,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO.: 4:20-cv-03002** |
| **BCI BRASIL CHINA IMPORTADORA E DISTRIBUIDORA S.A.,** | § § § | |
| **Defendant.** | § § | |

**PLAINTIFF PETROCHINA INTERNATIONAL (AMERICA), INC.'S**
**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,**
**AND IN THE ALTERNATIVE, TO COMPEL ARBITRATION**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff PetroChina International (America), Inc. ("PetroChina" or "PCIA") files this Response in Opposition to Defendant's Motion to Dismiss, and in the Alternative, to Compel Arbitration (the "Motion"), and respectfully shows the Court the following:

**I.**
**Introduction**

PCIA and Defendant BCI Brasil China Importadora E Distribuidora S.A. ("BCI") have done dozens of transactions with one another over the last five years. The most recent transaction, which involved the sale of ethanol, is the deal that is the subject of this lawsuit. Like the parties' prior transactions, the initial terms of the subject transaction were circulated in an email from PCIA to BCI. The initial terms were sent by email on January 24, 2020 and the ethanol was scheduled to ship to Brazil between March 5-15, 2020. Following BCI's acceptance of PCIA's offer, and consistent with every transaction between the parties throughout their course of dealings, PCIA

1

sent BCI a formal contract (the "Longform Contract") memorializing the terms of the transaction on February 6, 2020.  Like prior transactions between PCIA and BCI, the Longform Contract incorporated certain terms from the commodity supplier. In this transaction, Valero was the supplier of the ethanol, so the Longform Contract incorporated Valero's Marketing and Supply Company's General Terms and Conditions For Petroleum Product Purchases/Sales dated 2014 (the "Valero GTC").  Those terms and conditions specifically provide that the laws of Texas govern and that "the sole jurisdiction for any claims shall be in the State or Federal courts having jurisdiction thereof located in Harris County, Texas." These terms were incorporated into the Longform Contract because Valero was PCIA's supplier of the ethanol, which was shipped across Texas, and departed from the Port of Galveston, Texas.  The Longform Contract does not contain any language that conflict with the choice of law and forum selection provisions in the Valero GTC.  After both PCIA and BCI performed certain contractual obligations, and as the ethanol shipment approached the Brazilian destination port in late March 2020, BCI abruptly rejected the ethanol shipment—claiming a force majeure event—giving rise to the present suit.

In its Motion to Dismiss, BCI objects to the jurisdiction of this Court and to venue.  BCI's arguments ring hollow.  Like every transaction between PCIA and BCI, the subject transaction involved a longform contract drafted in and sent from Houston, Texas that confirmed and detailed the terms of the transaction, including choice of law and forum selection provisions.  Like every prior longform contract sent to BCI, the subject Longform Contract included language stating that the terms therein were binding unless BCI promptly advised PCIA that it objected to the terms of the Longform Contract.  BCI never notified PCIA that it disagreed with those terms in this transaction.

Aside from the terms of the binding Longform Contract between PCIA and BCI that included Texas choice of law and Harris County forum selection provisions, BCI's argument that it could not reasonably anticipate being hauled into a Texas court is not justifiable.  A majority of the transactions between PCIA and BCI over the last five years, including the subject transaction, involved the shipment of ethanol or petroleum products that were loaded in and departed from ports in the Southern District of Texas.  In fact, since 2018, all but one shipment to BCI left from ports in this judicial district.[1]  BCI was on notice of the important role Texas played in these transactions. For instance, the departure port for each shipment sent to BCI is identified in the contracts between PCIA and BCI.

Accordingly, as set forth in the parties' Longform Contract, jurisdiction and venue for this dispute are proper in this Court, and BCI's Motion should be denied.

## II.
## Background

### A.    The Parties' Course of Dealings

PCIA is an energy commodities trading company primarily engaged in buying and selling commodities such as natural gas, crude oil, petroleum products and petrochemicals.  Its principal place of business is Houston, Texas (Decl. R. Dempsey at ¶ 2.)  From 2016 – 2020, PCIA entered into 49 agreements with BCI for the sale of ethanol, gasoline, or diesel fuel, including the subject transaction.  (*Id.* at ¶ 4.)

In its transactions with BCI, it was PCIA's practice to send an email with the initial terms of the transaction such as an offer of sale in a certain quantity, at a certain price, for delivery by or around a particular date.  (*Id.*)  Upon receiving confirmation of BCI's willingness to purchase the

---

[1] During this period, the one shipment to BCI that did not depart from a port in the Southern District of Texas departed from the neighboring Port of Beaumont, Texas.

commodity, PCIA then sends a longform contract providing further details about the terms of the transaction.  (*Id.*)  Every longform contract sent to BCI was drafted in and sent from PCIA's Houston, Texas office. (*Id.* at ¶ 5.)  The terms of these longform contracts routinely incorporate the general terms and conditions, choice of law and forum selection provisions from PCIA's supplier contracts.  (*Id.*)  In doing so, it has been PCIA's intention and practice to mirror and incorporate select contractual provisions, like choice of law and venue provisions, from its supplier contracts, so that in the event there is a dispute it can be resolved in one proceeding with all parties present.  (*Id.*)  The bottom of every longform contract includes language stating that unless BCI objects, "the terms and condition herein shall be considered binding on both parties."  (*Id.* at ¶ 6.) BCI has never objected to any of PCI's longform contracts over five years.  (*Id.*)   PCIA has never considered the longform contract a mere formality as BCI claims in its Motion. (*Id.* at ¶ 4.)

The load and shipping ports for a majority of the commodity shipments from PCIA to BCI are located within the Southern District of Texas.  (Decl. T. Coppola at ¶ 4.) The other shipments sailed from ports in Louisiana, Mississippi, and in three instances from European ports.  (*Id.*) Moreover, of the eight (8) transactions between PCIA and BCI from 2018 – 2020, the load port for all but one of the shipments was within this federal judicial district.  (*Id.*)  The load port for the one transaction shipping from a port outside of this district during this time period was Beaumont, Texas.  (*Id.*)

For payment, PCIA usually directs BCI to wire money to its bank, JP Morgan Chase, which is headquartered in New York.  (Decl. R. Dempsey at ¶ 7.)  JP Morgan Chase has many bank branches in this judicial district and PCIA can access the account and its funds from this judicial district.  (*Id.*)  Accordingly, the fact that JP Morgan Chase is headquartered in New York has had

no effect on PCIA's operations and makes no meaningful difference to PCIA when compared to any bank other than JP Morgan Chase, headquartered in this district. (*Id.*)

**B.      The Parties' Subject Agreement**

The initial terms of the subject transaction between PCIA and BCI were circulated in writing on January 24, 2020.  (*Id.* at ¶ 8.)  Among other terms, the offer included the amount of ethanol (10,000 CBM),[2] the price, and the approximate load date.  (*Id.*)  At the bottom of the email offer, it states "NY law to apply with arbitration."[3]  Immediately thereafter, it provides that the "Valero GTC" also apply.  (*Id.*)  BCI promptly and simply responded to the offer stating "Bci agree" [*sic*].  (*Id.*)

Consistent with the 48 prior agreements between PCIA and BCI, PCIA followed up days later, on February 6, 2020, with a longform contract governing the subject transaction. (*Id.* at ¶ 9.) The Longform Contract was drafted in and sent from PCIA's Houston, Texas office **before the parties commenced performance** of the contract.  (*Id.* at ¶ 9; Decl. T. Coppola at ¶ 5.)  Like the parties' prior transactions, the Longform Contract provided more specific details about the transaction and filled in certain information, such as delivery instructions and load port, which were not included in the January 24, 2020 email. (Decl. R. Dempsey at ¶ 9.)

In particular, under the heading "Other Terms and Conditions," the Longform Contract states in relevant part:

> **VALERO MARKETING AND SUPPLY COMPANY'S GENERAL TERMS AND CONDITIONS** FOR PETROLEUM PRODUCT PURCHASES/SALES DATED 2014, ALONG WITH VALERO MARKETING AND SUPPLY COMPANY'S MARINE PROVISIONS 2017 EDITION,[4] AND SUBSEQUENT

---

[2] CBM stands for cubic meters.

[3] Venue for adjudication of disputes is not set forth in that email.

[4] Because the primary objective of the agreement between PCIA and BCI is the sale of a good, i.e., ethanol, and is not directly linked to the operation of a ship, the agreement is not a maritime contract.  *See Alphamate Community GMBH*

AMENDMENTS **ARE HEREBY INCORPORATED INTO AND FORM PART OF THIS CONTRACT** AND TOGETHER WITH THE FOREGOING SHALL CONSTITUTE THE ENTIRE AGREEMENT. THE LATEST VERSION OF BOTH DOCUMENTS IS **AVAILABLE AT WWW.VALERO.COM -> "PRODUCT AND SERVICES" -> "BUSINESS" -> "NOTICES".**

(*Id.* ¶ 10) (emphasis added). Valero's Marketing and Supply Company's General Terms and Conditions for Petroleum Product Purchases/Sales Dated 2014 (the "Valero GTC")—which are incorporated into the agreement between PCIA and BCI pursuant to the above language—provide in Article 17 that "[t]he parties specifically agree that the **sole jurisdiction** for any claims **shall be in the State or Federal courts** having jurisdiction thereof located **in Harris County, Texas**. (*Id.* at ¶ 11 and Ex. B thereto at p. 27.) (emphasis added). As worded, this is a mandatory choice of law and forum selection clause.

Further, in capitalized letters, the Longform Contract provided to BCI ends with:

IF YOU ARE NOT IN AGREEMENT WITH ANY OF THE ABOVE PROVISIONS, PLEASE ADVISE BY RETURN EMAIL TO THE CONTRACT ADMINISTRATION DEPT. (CONTRACTS@PETROCHINA-USA.COM). IF NO RESPONSE IS RECEIVED WITHIN TWO BUSINESS DAYS OF RECEIPT, THE TERMS AND CONDITIONS HEREIN SHALL BE CONSIDERED BINDING ON BOTH PARTIES. NONE OF THE TERMS OF THIS CONTRACT MAY BE MODIFIED UNLESS MUTUALLY AGREED TO IN WRITING.

(*Id.* at ¶ 12, Ex. A thereto.) This language about the binding nature of the terms in the Longform Contract is in every longform contract between the PCIA and BCI. (*Id.* at ¶ 12.) When transmitting the Longform Contract to BCI, PCIA sent it to the three BCI email addresses where these longform contracts were always sent, including the address of the BCI representative (Luciano Menezes[5]) who agreed to the ethanol purchase. (*Id.* at ¶ 13.) Like the 48 prior

---

*v. CHS Europe SA*, 627 F.3d 183 (5th Cir. 2010). For the same reasons, the subject transaction is not a "marine claim" subject to the Valero Company's Marine Provisions governing jurisdiction and venue for the resolution of disputes.

[5] As Director of Operations for BCI, Mr. Menezes is "responsible for negotiating and entering into contracts with BCI's suppliers," has been with BCI for 16 years, and supplied a declaration in support of BCI's Motion. (*See* Exhibit 1 to BCI's Motion to Dismiss, and in the Alternative to Compel Arbitration, ECF No. 17.)

agreements between PCIA and BCI, BCI expressed no disagreement with the terms of the Longform Contract. (*Id.*)

Without notice of any objection from BCI, PCIA acted in reliance on the terms of the Longform Contract and performed its contractual obligations in Texas. (*Id.* at ¶ 14.) The subject ethanol was purchased from Valero in Texas, delivered to PCIA in Texas, transported across Texas, loaded onto a ship in Texas, and departed for delivery to BCI from a Texas port (Galveston). (Decl. T. Coppola at ¶¶ 6-7.) The subject 10,000 CBM of ethanol was loaded onto the ship "Navig8 Achroite" in the Port of Galveston on or around March 11, 2020. (*Id.*) The ship departed the Port of Galveston headed for Brazil around March 12, 2020 pursuant to the terms of the Longform Contract. (*Id.*) None of the conduct or activities related to performance of the contract had anything to do with or had any contact with the State of New York. (*Id.* at ¶ 6.) Among the first things BCI did in performance of its contractual obligations was to send PCIA specific discharge instructions on March 20, 2020—a month and a half after the Longform Contract was circulated. (*Id.* at ¶ 5.)

## C.     BCI's Breach of the Agreement

The estimated time of arrival at the designated port in Brazil was March 24, 2020. (*Id.* at ¶ 7.) On March 23, 2020, BCI sent revised discharge instructions to PCIA asking that 2,500 cubic meters of the product be discharged to a terminal at the port of Itaqui, Brazil, and that the balance be discharged to a terminal at the port of Suape, Brazil. (*Id.* at ¶ 8.) On March 24, 2020, as the vessel approached the Port of Itaqui, Brazil, BCI notified PCIA via e-mail that due to the "situation for the convid 19 [sic] we won't be able to sell this product in at least 30 to 60 days," and that "we will need this time to make payment to [PCIA]." (*Id.*)

7

In response to BCI's request to delay payment, PCIA proposed discharging the product to the designated terminal under a "bonded warehouse regime" as an alternative to the agreed-upon discharge and payment terms. (*Id.* at ¶ 9.)  BCI, however, did not respond.  (*Id.*)  Instead, on March 25, 2020, BCI sent an email to PCIA stating BCI was terminating the agreement "due to Act of God events and force majeure."  (*Id.*)  BCI stated that due to the COVID-19 pandemic, the ethanol that BCI had contracted to purchase "cannot be adsorbed [sic] by the Brazilian market" and "the acquisition of the product by BCI would represent an excessive burden."  (*Id.*)  On March 26, 2020, PCIA replied to BCI's termination notice by email, stating that the circumstances identified by BCI did not qualify as a force majeure event under the agreement and applicable law, and therefore, termination of the contract was not available to BCI. (*Id.* at ¶ 10.)

BCI failed to reply; therefore, as PCIA had proposed doing, PCIA procured bonded warehouse storage for the ethanol in the two destination ports of Brazil.  (*Id.* at ¶ 11.)  Consistent with BCI's discharge instructions prior to its attempt to terminate the parties' agreement, PCIA discharged 2,500 CBM of ethanol in the Port of Itaqui on March 26, 2020 and about 7,500 CBM in Suape, Brazil on March 30, 2020.  (*Id.*)  PCIA then notified BCI of the details regarding discharge of the product.  (*Id.*)

**D.     The Present Lawsuit and Proper Service of Process**

On August 26, 2020, PCIA filed suit against BCI, alleging breach of contract due to BCI's attempt to terminate the parties' contract.  (*See* ECF No. 1.)  Upon receiving the Summons, PCIA proceeded to serve process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention") and took additional measures to ensure BCI had notice of this suit.

PCIA has expended significant time and resources to ensure not only proper service, but also to ensure BCI has been on notice of this suit since it was filed by, among other things, forwarding the Summons and Complaint to known lawyers and other agents of BCI.  Despite service delays and issues with Brazilian postal channels due to the Coronavirus pandemic, BCI was properly served as required under the Hague Convention. BCI admits as much by acknowledging the December 29, 2020 receipt of a letter rogatory from the Superior Court of Justice in Brazil.  (BCI's Motion at 7, Decl. L. Menezes at ¶¶ 39-40; Decl. A. Napoleão at ¶¶ 6-8.) The letter clearly conveys that BCI has been sued in this Court and contains a website link for obtaining the case documents.  (Decl. A. Napoleão at ¶ 9, Ex. E, thereto.)  Process is typically served in Brazil by such letters with website links to case documents.  (*Id.* at ¶ 9.)

      *1. PCIA Has Complied with and Served Process Pursuant to the Hague Convention.*

To ensure compliance with the Hague Convention, PCIA undertook the following steps to effectuate proper service of process:

- On September 3, 2020, counsel for PCIA transmitted the Request for Service, Original Complaint, Summons, Order for Conference, and Portuguese translations of such documents by email to the Brazilian Ministry of Justice and Public Security (the "Brazilian Ministry"). (Decl. A. Napoleão at ¶ 3.)  Receipt of this email and the attached documents was acknowledged by the Brazilian Ministry on September 3, 2020. (*Id.*)

- PCIA engaged a Brazilian law firm to assist and monitor service of the documents described above.  The law firm has been in frequent communication with the Brazilian Ministry regarding the status of the Request for Service.  (*Id.* at ¶ 2.)

- On October 27, 2020, PCIA made a second Request for Service because the Brazilian Ministry refused to serve the original package of documents due to the inclusion of a setting notice that was less than 180 days from the receipt of PCIA's Request for Service.  (*Id.* at ¶ 4.)  Accordingly, the second request included the Summons and Original Complaint along with translations thereof, but it omitted the Order of Conference.  (*Id.*)

- On December 29, 2020, service of process was properly effectuated on BCI.  (*Id.* at ¶ 6-8.)  Proper service has been confirmed.  The Brazilian Postal Service's online

tracking report confirms delivery of the Summons and Complaint on that day.  (*Id.* at ¶ 6, Ex. D thereto, incl. sworn translation.) Further, BCI acknowledges its receipt of the letter rogatory regarding this lawsuit.  (*See* BCI's Motion at 7; Decl. L. Menezes at ¶¶ 39-40; Ex. F to Motion.)

- The letter rogatory that BCI admits it received contains a website link to the Summons and Complaint in this case.  (*Id.*; Decl. A. Napoleão at ¶ 9.)  A sworn translation of the letter rogatory is attached as Exhibit E to the Declaration of Aluzio Napoleão.  This type of letter with a website link to the case documents is the way service of process is typically made in Brazil and is specifically authorized by Brazilian rules for service.  (*Id.*, incl. applicable excerpts of Brazilian rules.)

- The official certificate of service from the Brazilian Ministry, however, has not been received.  PCIA is informed that the Coronavirus pandemic has caused significant disruptions to the Brazilian postal service and that the postal receipt evidencing service of process,[6] which triggers the Brazilian Ministry's official certificate confirming service of process, has apparently been lost.  (*Id.* at ¶¶ 11-12.)

- BCI has failed to challenge service in Brazil, and the Brazilian Superior Court has issued a certificate confirming that the deadline for BCI to challenge service of process in Brazil has passed.  (*Id.* at ¶ 10.)  Consistent with Brazilian practice, the Brazilian Superior Court has requested the Brazilian Public Defender's Office make any arguments, if there are any, on behalf of BCI regarding service. (*Id*, incl. certified translation.)  To date, the public defender has not responded.  (*Id.*)

*2. PCIA Has Undertaken Additional Measures to Ensure BCI's Due Process Rights Are Protected and that It Can Defend Itself in the Present Dispute.*

On multiple occasions since filing this lawsuit on August 26, 2020, PCIA has sent BCI, its known lawyers, and its other known agents copies of the Complaint and Summons.  These steps include the following:

- PCIA sent English and Portuguese copies of the Original Complaint, Summons, and Order for Conference directly to BCI at BCI's primary office in Brazil.  On September 9, 2020, these documents were sent by email to PCIA's business contact at BCI, Mr. Luciano Menezes, who signed a Declaration in support of BCI's Motion to Dismiss. (Decl. A. Napoleão at ¶ 14.)

---

[6] PCIA's understanding is that the missing postal receipt is much like the green return receipt a sender receives in the United States when sending correspondence by certified mail, return receipt requested.

- These documents were also sent on September 9, 2020 and October 9, 2020 to BCI's Brazilian counsel, who communicated PCIA's inhouse counsel before this lawsuit was initiated. (*Id.* at ¶¶ 14-15.) PCIA received an email receipt confirming that Brazilian counsel for BCI received the email attaching the case documents.  (*Id.* at ¶ 15.)

- The Complaint and Summons, along with translations, were also hand-delivered to BCI at its office in Brazil by courier on October 21, 2020.  (*Id.* at ¶¶16-17.)  PCIA obtained a signed receipt evidencing that said delivery was received at BCI's office. (*Id.*, Ex J, thereto.)

- On October 23, 2020, PCIA's counsel again reached out to BCI's Brazilian counsel regarding the case, again attaching the Complaint and Summons, including translations thereof, and also providing notice of the November 9, 2020 Initial Conference with this Court.  (*Id.* at ¶ 18.)

- On October 28, 2020, a lawyer in Miami, Florida, Ms. Patricia Acosta, contacted PCIA's undersigned lawyers by telephone about this suit.  Ms. Acosta stated that she had not been retained to represent BCI in this action, but that she represents BCI in other matters. She confirmed BCI's receipt of the Original Complaint, Summons, and Order for Conference, but that it was her understanding at that time that BCI had not yet been served under the Hague Convention. In addition to their telephone conference, Ms. Acosta and the undersigned lawyer exchanged email correspondence on that day and on October 30, 2020.  (*See also* PCIA's Supplemental Status Report, ECF No. 9.)

- On February 3, 2021, BCI's attorney in this dispute, Mr. Arthur Feldman, contacted PCIA's attorneys by email regarding this suit for first time.  Mr. Feldman subsequently filed BCI's Motion to Dismiss on March 9, 2021.  (ECF No. 17.)

## III.
## Argument and Authorities

**A.     The Parties' Contract Requires that Disputes Be Resolved Under Texas Law in the Federal or State Courts of Harris County, Texas.**

The parties' Longform Contract incorporates language stating that "*[t]he parties specifically agree that the sole jurisdiction for any claims shall be in the State or Federal courts having jurisdiction thereof located in Harris County, Texas*."  (Decl. R. Dempsey at ¶¶ 9-11, Exh. A and. B, thereto.)  Accordingly, adjudication of this dispute in this Court is proper.

It is well settled that inclusion of a forum selection clause in a parties' contract constitutes submission to the jurisdiction of that court. *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964). Forum selection clauses "should control except in unusual cases." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013). "[E]nforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (KENNEDY, J., concurring); *see also Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995); *Rimkus Consulting Group, Inc. v. Cammarata*, 2007 WL 1520993, at *5 (S.D. Tex. May 22, 2007). Moreover, the party defying the forum-selection clause bears the burden of establishing that resolution in the specified forum is unwarranted. *Id*.

1. *The Longform Contract, with Its Choice of Law and Forum Selection Clauses, Is Binding on the Parties.*

When a federal court sitting in diversity interprets the validity of contractual terms, including choice of law and forum selection clauses, the court applies the rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 610 F.2d 371 (5th Cir. 1980) (applying substantive state contract law). Under Texas law, a party that performs obligations pursuant to the terms of an amended contract is presumed to accept the terms of those amendments. *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 298-300 (Tex. 1981) (holding that a party's failure to object to new contractual terms combined with accepting the contractual benefits of and performing obligations under that contract constituted acceptance of the new contractual terms); *Sw. Indus. Imp. & Exp., Inc. v. Borneo Sumatra Trading Co., Inc.*, 666 S.W.2d 625, 628 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

If the parties have an extensive business relationship and course of dealings—like PCIA and BCI—silence may constitute acceptance of a contract or revised contractual terms. *Laredo Nat. Bank v. Gordon*, 61 F.2d 906, 907 (5th Cir. 1932) ("where the relation between the parties is such that the offeror is justified in expecting a reply, or the offeree is under a duty to reply, the latter's silence will be regarded as acceptance. Under such circumstances, 'one who keeps silent, knowing that his silence will be misinterpreted, should not be allowed to deny the natural interpretation of his conduct.")(citing Williston on Contracts, §§91, 91a.); *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 915 (S.D. Tex. 1998), *aff'd sub nom*. *Den Norske Stats Oljeselskap v. Hydrocarbon Processing, Inc*., 161 F.3d 8 (5th Cir. 1998); Restatement (Second) of Contracts § 69 (1981); TEX. BUS. & COM. CODE ANN. 2.207, § 2.201(b) (between merchants a writing in confirmation of the contract is sufficient to meet the statute of frauds if the party receiving it has notice of its contents and does not object within 10 days); *Brooks Towers Corp. v. Hunkin-Conkey Const. Co.*, 454 F.2d 1203, 1207 (10th Cir. 1972); *Suitter v. Thompson*, 358 P.2d 267 (1960).

The facts of the present suit are similar to those this Court faced in *Den Norske Stats Oljeselskap v. Hydrocarbon Processing, Inc.,* 992 F. Supp. 913 (the "*Hydro*" case). There, the parties entered into contracts for the sale of propane. *Id.* Following an agreement on the quantity, price, and delivery date of the propane, the deal broker sent confirmatory faxes which "specified the seller, buyer, product, quality, quantity, delivery, price, payment, title, risk, distribution, confidentiality and commission." *Id.* at 914. The broker's faxed confirmations did not require a response. *Id.* Upon being sued for breaching the contract, Defendant, *Hydrocarbon Processing* (*Hydro*), denied that the fax confirmations constituted a contract. *Hydro*, however, had done 72 prior deals with the broker and "[i]n none of [those] seventy-two transactions . . . did [Defendant]

*Hydro* tell [the broker] that it required additional documents to close a deal." *Id.* This Court concluded a contract had been formed on the terms set forth in the confirmation faxes and that Defendant *Hydro* breached the agreement when it repudiated the contract. *Id.* at 914-916. Holding that at a minimum, Defendant *Hydro* acquiesced to the contracts, this Court articulated Texas law that if the relationship between the parties is such that a party's silence might be construed as acceptance or otherwise misinterpreted, a party (especially a merchant) like *Hydro* has "to object openly and promptly" if it does not agree to the terms set forth in the confirmatory documents.[7] *Id.*

Like *Hydro*, which participated in 72 prior transactions without complaining about the contracting practices, BCI entered into 49 agreements with PCIA between 2016 and 2020 without ever objecting to PCIA's contracting practices. (Decl. R. Dempsey at ¶ 6.) In each instance, PCIA sent a confirmatory longform contract from Houston to BCI with detailed terms of the agreement after BCI confirmed its interest in pursuing the transaction. (*Id.* at ¶ 4.) Each of those longform contracts provided that BCI must provide PCIA with notice of any objections to the terms of the longform contract, and that the terms therein would be considered binding on both parties if there was no response. (*Id.* at ¶ 6.) Importantly, like the *Preston Farm & Ranch Supply* case, not only did BCI fail to object to the Longform Contract and thus induce PCIA to rely on it, but BCI took affirmative acts in performance of its obligations after receiving the Longform Contract. BCI's affirmative acts after receipt of the Longform Contract included sending PCIA discharge instructions for the first time more than six weeks after receiving and not objecting to the Longform Contract. (Decl. T. Coppola at ¶ 5.)

---

[7] Rejecting *Hydro's* defense that the statute of frauds prohibited enforcement of the alleged contract, this Court noted that both parties were merchants and that accordingly the transaction fell within the merchant's exception to the statute of frauds at Tex. Bus. & Com. Code § 2.201(b). *Id.*

As the above authorities provide, under the facts surrounding this transaction and the parties' long course of dealings, the Longform Contract is binding upon both PCIA and BCI. Accordingly, the choice of law and forum selection clauses incorporated into that contract—which mandate that disputes be resolved under Texas law in the State or Federal courts of Harris County, Texas—are binding on the parties.

2. *The Public Policy Interests of Texas Favor Resolution Here Pursuant to the Longform Contract's Terms.*

Forum selection clauses are generally enforceable. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-11 (1972); *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (*citing In re AIU Ins. Co*., 148 S.W.3d 109, 112 (Tex.2004)).  A trial court should enforce a forum-selection clause absent clear evidence that (1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial. *Id.*; *see also M/S Bremen.*, 407 U.S. at 10-11.

As set forth above, the Longform Contract is valid and binding upon the parties.  PCIA acted in reliance on the terms of the Longform Contract and enforcing the terms of the parties' contract is reasonable.  There is also no evidence of fraud or overreaching that might justify adjudicating this dispute in a forum other than the one set forth in the parties' Longform Contract. BCI also cannot argue that this Court is "seriously inconvenient for trial" in comparison to an unknown arbitration venue under New York law.  This forum is the one set forth in the parties' longform and binding contract and it is one of the close United States venues to Brazil.  This is clearly a convenient forum for the parties.

Significantly, Texas, not New York or any arbitration forum, has substantial public policy interests that favor resolution in this state and forum.  The ethanol at issue in the subject contract

was delivered to PCIA in Texas, transported across, and shipped to BCI from a Texas port. (Decl. T. Coppola at ¶ 6.) The ethanol did not come from or transit New York. (*Id.*) New York has no connection to and therefore no public policy interests in the subjection transaction. (*Id.*) Texas, however, has strong public policy interests in adjudicating disputes regarding commodities that are sold in, transported across, and depart from this state. Due to the public policy interests favoring resolution here, this dispute should be resolved here. To this end, even if the January 24, 2020 email between PCIA and BCI constituted the final agreement between the parties (which it does not), Texas and federal law dictate that enforcing a forum selection clause requiring resolution under New York law in an unspecified arbitration forum is inappropriate. Accordingly, this dispute should be resolved in here consistent with the parties' Longform Contract's forum selection clause.

## B.  This Court Has Jurisdiction Over BCI.

BCI's objections to jurisdiction and proceeding in this Court are disposed of for the reasons set forth above. *See, e.g., Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964) (a contractual forum selection clause constitutes submission to the jurisdiction of that court); *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013) ("[f]orum selection clauses should control except in unusual cases.") Regardless, however, BCI's assertions that it does not have sufficient contacts with this district to warrant jurisdiction are not accurate.

PCIA does not need to establish jurisdiction by a preponderance of the evidence; "a *prima facie* showing suffices." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). The "court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Id.* The personal jurisdiction inquiry can be consolidated into a convenient three-step analysis: (1) whether the defendant . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there;

(2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.  *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985); *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002), abrogated on other grounds by *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 197 L. Ed. 2d 826 (2017).

BCI has purposely directed its activities toward Texas, has availed itself of the privileges of conducting business in this state, and has forum-related contacts giving rise to this dispute.  This is demonstrated by the fact that the Longform Contract, like the 48 prior longform contracts, between the parties was authored in and sent from PCIA's U.S. headquarters in Houston, Texas and the fact that the subject ethanol was transported across and shipped from Texas.  (Decl. T. Coppola at ¶ 6.)  Additionally, PCIA's supplier of the subject ethanol—Valero—is headquartered in Texas. (*See* www.valero.com/about/offices.)   Valero requires that disputes arising out of transactions such as this one be resolved in this forum under Texas law, which is why the parties' Longform Contract incorporates those provisions of the contract with Valero.  (*See* Decl. R. Dempsey at ¶ 5.)

Further, aside from the subject transaction, BCI has directed its activities at this forum on numerous occasions.  PCIA is headquartered in Houston, and the parties have had an extensive course of dealings, including 49 agreements over the last five years.  (*Id.* at ¶ 4.)  Moreover, the longform contracts sent by PCIA to BCI were drafted in and sent from Houston, Texas.  (*Id.* at ¶ 5.)  Even further, an overwhelming majority of the shipments that were the subject of agreements between PCIA and BCI transited across Texas and departed from ports in this judicial district or other Texas ports.  (Decl. T. Coppola at ¶ 4.)   Not only does the parties' binding Longform Contract provide for resolution of the present dispute in this forum, but BCI has availed itself of

the privilege of conducting business here, and the instant dispute arises out of BCI's forum-related contacts.  For these reasons, the exercise of personal jurisdiction over BCI is fair and reasonable.

**C.      Venue Is Proper Here.**

As with BCI's objections to jurisdiction, its objections to venue in this Court are disposed of by the fact that the forum selection clause directing disputes be resolved here was incorporated into the binding Longform Contract as discussed above.  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013) (Forum selection clauses should usually control.) Regardless of the Longform Contract and contrary to BCI's argument, however, venue in this Court is proper because a substantial portion of the events giving rise to this dispute occurred in this judicial district.  *See* 29 U.S.C. § 1391(b)(2).  PCIA's principal place of business is in Houston, Texas, and all of the longform contracts sent by PCIA to BCI, including the one involved here, were drafted in and sent from PCIA's Houston office.  (*See* Decl. R. Dempsey at ¶ 5.)  Further, the ethanol at issue in the subject transaction was transported across and shipped from this judicial district.  (Decl. T. Coppola at ¶ 4.)  Contrary to BCI's assertion, PCIA's use of a bank that is headquartered in New York, JP Morgan Chase, should be of no significance given the bank's branches in this judicial district and PCIA's ability to access funds entirely in this district. (*See* Decl. R. Dempsey at ¶ 7.)

**D.      Compelling Arbitration Is Inappropriate.**

Again, BCI's argument in favor of arbitration under New York law in an unnamed venue is disposed of by the forum selection clause incorporated into the binding Longform Contract as discussed above.  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013).  In other words, BCI's argument in favor of arbitration fails because there is no agreement to arbitrate this dispute.

18

BCI argues that this case must be arbitrated pursuant to 9 U.S.C. § 2 because the subject contract is a "maritime contract" that implicates the Federal Arbitration Act ("FAA").  This contention, however, is incorrect.  The subject agreement between the parties is not a "marine contract" and arbitration is not required.

"In general, a maritime contract relates to a vessel in its use as such, to navigation on navigable waters, to transportation by sea, or to maritime employment."  CONTRACT, Black's Law Dictionary (11th ed. 2019).  "To be maritime, a contract (1) must be for services to facilitate activity on navigable waters and (2) must provide, or the parties must expect, that a vessel will play a substantial role in the completion of the contract."  *Barrios v. Centaur, L.L.C.*, 942 F.3d 670, 680 (5th Cir. 2019), *cert. denied sub nom. Centaur, L.L.C. v. River Ventures, L.L.C.,* 140 S. Ct. 2675 (2020); *see also* 9 U.S.C.A. § 1 (West) ("Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction."); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23, 125 S. Ct. 385, 393, 160 L. Ed. 2d 283 (2004) ("To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute . . . the answer depends upon ... the nature and character of the contract.") (internal quotations omitted).

The agreement between PCIA and BCI is not "for services to facilitate activity on navigable waters."  Indisputably, the primary objective of the agreement is the sale of ethanol. BCI confirmed this in its March 24 and 25 attempts to repudiate the agreement by saying "we would like to certify the termination of the deal executed . . . **related to the acquisition of 10,000m3 of anhydrous ethanol** ('Deal'), due to Act of God events and force majeure." (Decl. T.

19

Coppola at ¶ 9, Ex. A, thereto) (emphasis added).  The objective of the transaction was not to "facilitate activity on navigable waters," but instead for the sale and acquisition of ethanol. Accordingly, the subject agreement between the parties is not a maritime contract that might implicate the FAA as BCI contends.[8]

**E.      BCI Has Been Properly Served and Has Notice of This Suit.**

*1.  Brazil is a signatory to the Hague Convention on Service Abroad*

Federal Rule of Civil Procedure 4(f) provides that service of process on a foreign corporation may be made "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents [the 'Hague Convention']." FED. R. CIV. P. 4(f)(1).  This rule conforms with the due process requirement that every method of service provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) ("Another purpose of the [Hague] Convention is to assure foreign defendants adequate notice.")  The Hague Convention applies "in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." *Id.* (quoting Hague Convention art. 1, Nov. 15, 1965, 20 U.S.T. 362, T.I.A.S. No. 6638).

On November 29, 2018, Brazil became a signatory to the Hague Convention. *Id.* at Status Table.[9]  Because BCI is a Brazilian corporation and the Complaint and Summons must be sent

---

[8] For the same reasons, i.e., this agreement is not a maritime contract, the Valero Maritime General Terms and Conditions do not apply to this transaction.

[9] The entirety of the Hague Convention, including the Status Table, which lists the member countries, date of accession, and any reservations and declarations of the member countries, is available at: www.hcch.net.

abroad to effectuate service, the Hague Convention applies. *See Schlunk*, 486 U.S. at 699. Further, Brazil's objections to the Hague Convention's provisions governing alternative means of service, such as postal channels, means service must be accomplished by serving the designated central authority in Brazil. *See id.*; Hague Convention, art. 2, 5, 10, Reservations of Brazil. Furthermore, all documents to be served in Brazil through the central authority must be translated into Portuguese. *Id.* at Declaration of Brazil. Brazil has designated the Department of Assets Recovery and International Legal Cooperation within its Ministry of Justice and Public Security as its central authority pursuant to Article 2 of the Hague Convention.[10] Upon service upon the Brazilian authority, that ministry must serve process in accordance with the internal laws of Brazil or by a particular method requested by the applicant, provided that such method is compatible with the receiving state's laws. Hague Convention art. 5; *Schlunk*, 486 U.S. at 698–99.

### 2. BCI Was Properly Served with Process Pursuant to the Hague Convention.

As set forth above, BCI was properly served pursuant to the Hague Convention. The official correspondence from the Brazilian Ministry dated December 10, 2020 clearly conveys that BCI has been sued in this Court noting in capitalized letters that it is from the Brazilian Ministry of Justice and Public Security (the "Brazilian Ministry"). (*See* Decl. A. Napoleão at ¶ 8, incl. Ex. E, thereto.) Indisputably, this correspondence contains a link to the Summons and Complaint in this lawsuit. (*Id.*) Moreover, BCI has confirmed it received this official correspondence effectuating service of process under Brazilian law on December 29, 2020. (*See* BCI's Motion at 7; Decl. L. Menezes at ¶¶ 39-40, Ex. F.) The Brazilian Postal Service's online tracking report further confirms delivery of the Summons and Complaint on that day. (Decl. A. Napoleão at ¶ 6, Ex. D, thereto, incl. sworn translation). While the official certification of service has not been

---

[10]Available at: www.hcch.net/en/states/authorities/details3/?aid=1113

received due to a missing mail receipt, the Brazilian Ministry itself believes service has been properly made as evidenced by its own records and its formal declaration informing BCI that it missed the deadline to challenge service of process there.  (Decl. A. Napoleão at ¶¶ 7, 10-12.)

BCI's complaint that the Summons and Complaint were not attached to the official letter it received on December 29, 2020 is misplaced.  Service of process via a letter containing a website link where the case documents may be downloaded—as was done in this case—is the typical means by which service of process is made in Brazil as authorized by the country's applicable regulations and laws.  (*See* Decl. A. Napoleão at ¶ 9.)

   *3.  BCI Has Actual Notice and an Opportunity to Defend Itself.*

When a defendant has received actual notice of an action, the federal rules governing service should be liberally construed to effectuate service and uphold the jurisdiction of the court. *Nowell v. Nowell*, 384 F.2d 951, 954 (5th Cir. 1967); *Harvest Nat. Res., Inc. v. Ramirez Carreno*, CV H-18-483, 2020 WL 3063940, at *9 (S.D. Tex. June 9, 2020) (citing *Nowell*, 384 F.2d at 954) (plaintiff's reasonable efforts to effectuate service combined with defendant's actual notice made service effective); *Karlsson v. Rabinowitz,* 318 F.2d 666 (4th Cir.1963); *Rovinski v. Rowe,* 131 F.2d 687, 689 (6th Cir. 1942). Actual notice "satisfies the due process of law requirement" and "thus, provides the court with personal jurisdiction." *Frank Keevan & Son, Inc. v. Callier Steel Pipe & Tube, Inc.,* 107 F.R.D. 665, 671 (S.D.Fla.1985).  When service of process is imperfect, but the defendant has actual notice of the suit and the claims against it, unfair prejudice in connection with that imperfect service is necessary to sustain a motion to dismiss for insufficient process.  *See Chenevert v. Algiers Charter Sch. Ass'n, Inc.*, 2013 WL 4710408, at *6 (E.D. La. Aug. 29, 2013).

As set forth above, BCI has actual notice of this suit and the opportunity to defend itself. Its due process rights have been protected.  Since filing this suite, PCIA has undertaken numerous efforts to ensure both proper service and that BCI is aware of this suit so that it may defend itself. Moreover, BCI has not demonstrated that it has suffered any unfair prejudice in connection with service of process.  The Brazilian Ministry itself believes service has been properly made. The mere lack of the official certificate from the Brazilian Ministry further confirming service is not sufficient grounds to grant BCI's motion given the extensive evidence demonstrating service was properly accomplished and that BCI has notice of this suit.  Accordingly, BCI's motion to dismiss for insufficient process and service of process should be denied.

## IV.
## Conclusion

For the foregoing reasons, PCIA respectfully requests this Court deny Defendant BCI's Motion to Dismiss pursuant to Rule 12(b).

Respectfully submitted,

By: */s/ Edward John ("Jack") O'Neill, Jr.*
    Edward John ("Jack") O'Neill, Jr.
    Texas Bar No. 15288500
    Southern District of Texas No. 3696
    *Attorney in Charge*

PIERCE & O'NEILL, LLP
4203 Montrose Boulevard
Houston, Texas 77006
(713) 634-3600 Main
(713) 634-3638 Direct
(713) 634-3639 Facsimile
joneill@pierceoneill.com

OF COUNSEL:

Thomas J. Adair
Texas Bar No. 24047753
Southern District of Texas No. 1096168
tadair@pierceoneill.com
PIERCE & O'NEILL, LLP
4203 Montrose Boulevard
Houston, Texas 77006
(713) 634-3600 Main
(713) 634-3639 Facsimile

                              ATTORNEYS FOR PLAINTIFF
                              PETROCHINA INTERNATIONAL
                              (AMERICA), INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 30, 2021, a true and correct copy of the above instrument was served via the Court's ECF system upon all parties consenting to service through the same.

                              */s/ Edward John ("Jack") O'Neill, Jr.*
                              Jack O'Neill