**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **PETROCHINA INTERNATIONAL** | § | |
| **(AMERICA), INC.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION NO.: 4:20-cv-3002** |
| | § | |
| **BCI BRASIL CHINA IMPORTADORA** | § | |
| **E DISTRIBUIDORA S.A.** | § | |
| | § | |
| **Defendant.** | § | |

**BCI'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**
**AND REQUEST FOR ORAL ARGUMENT**

PetroChina's response to BCI's motion to dismiss or compel arbitration makes several arguments which merit reply, as follows:

**PetroChina Cannot Establish Compliance with the Hague Convention**

A court cannot exercise personal jurisdiction over a defendant that is not properly served. *McGuire v. Sigma Coatings, Inc*., 48 F.3d 902, 906–07 (5th Cir. 1995). PetroChina attempted service of process through the Hague Convention and acknowledges in its response that compliance with Hague Convention procedures for service is mandatory in this case. *See* Complaint (Dkt. #1) at ¶ 3; Response (Dkt. #24) at 20.[1]  BCI moved to dismiss under Rule 12(b)(4), insufficient process, and Rule 12(b)(5), insufficient service of process, because PetroChina failed

---

[1] The Supreme Court supports this view: "Article 1 defines the scope of the Convention, which is the subject of controversy in this case. It says: 'The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.' 20 U.S.T., at 362…This language is mandatory, as we acknowledged last Term in *Société Nationale Industrielle Aérospatiale v. United States District Court*." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 108 S. Ct. 2104, 2108 (1988).

to file a proof of service as required by the Hague Convention. Motion to Dismiss (Dkt. # 17) at 18 & n. 1.

PetroChina has now admitted that it has been unable to procure the required proof of service because it may have been lost in the mail. *See* Response (Dkt. #24) at 10; Napoleão Decl. (Dkt #24-3) at ¶¶ 11-12. PetroChina attempts to overcome this glaring deficiency by relying on a hearsay statement from its own attorney that "[d]uring conversations with staff at the Superior Court of Justice, they have confirmed that service of process was successfully made." Napoleão Decl. (Dkt #24-3) at ¶¶ 11-12. PetroChina also argues that email communications attaching the Complaint which were sent by PetroChina's counsel to BCI are sufficient under the circumstances. Neither argument satisfied the service of process requirements under the Hague Convention and Rule 4.

Article 6 of the Hague Convention provides, in mandatory terms, that the Brazilian Central Authority or its designee (in this case the Brazilian Superior Court of Justice), "shall complete a certificate in the form of the model annexed to the present Convention" and then "shall" forward the certificate to the applicant. In full, Article 6 states:

> The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention. The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service. The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities. The certificate shall be forwarded directly to the applicant.

Hague Convention, Art. 6 (available at https://assets.hcch.net/docs/f4520725-8cbd-4c71-b402-5aae1994d14c.pdf).[2] Brazil, upon joining the Hague Convention, filed a specific Declaration, also in mandatory terms, concerning the performance of Article 6: "Declaration pursuant to Article 6: When Brazil is the requested State, the required certificate in the form of the model annexed to the Convention must be signed by the Judge who has jurisdiction or by the Central Authority designated in accordance with the provisions of Article 2 of the Convention." Enacting Declaration, Art. 6 (available at https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=1399&disp=resdn). In turn, Rule 4(l)(2) & -(A), which applies here, provides that "Service not within any judicial district of the United States must be proved as follows: (A) if made under Rule 4(f)(1), as provided in the applicable treaty or convention." Taking these provisions together, for service to be effective under the Hague Convention on a Brazilian defendant Petrochina must supply the court with the required form proving service was accomplished, and the proof of service must be signed by either the Brazilian Central Authority or a judge of the Brazilian Superior Court of Justice.

   To put it bluntly, there is no testimonial exception available to the requirement that a conforming proof of service form must be in evidence for service to be effective under the Hague Convention and Rule 4(l), and certainly there is no exception based on the hearsay statement of a party's own lawyer. On the contrary, the Hague Convention and Rule 4(l) require formal proof of service, in a prescribed format, and do so in clear, mandatory terms. PetroChina's admission that it cannot supply the required proof of service is therefore fatal to its position. This court cannot

---

[2]   The official annexed form establishing proof of service, available at https://assets.hcch.net/docs/c40c5f9b-3148-4d1f-a874-9189edf0c0f3.pdf, is attached to this reply as Exhibit 1.

exercise jurisdiction over a foreign defendant from Brazil absent conforming proof of service in the manner required by the Hague Convention and Brazil's enacting declarations.

Nor can PetroChina substitute another form of delivery of the Complaint, such as through emails from counsel for PetroChina to agents of BCI. Under Article 10 of the Hague Convention, delivery through postal channels directly to persons abroad can be sufficient, but only if "the State of destination does not object." Hague Convention, Art. 10. Brazil, however, filed a reservation objecting to any alternative means of service under Article 10: "Reservation to Article 10: Brazil is opposed to the methods of transmission of judicial and extrajudicial documents provided for in Article 10 of the Convention." Enacting Reservation, Article 10 (available at https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=1399&disp=resdn). Alternate service methods for Brazilian defendants are therefore not allowed.

In a lengthy and carefully reasoned opinion handed down last year in an analogous case involving a Chinese defendant, Chief Judge Lynn from the Northern District of Texas confirmed that service by email was not permitted under the Hague Convention because China, like Brazil, registered express reservations to any means of alternative service under Article 10. Among the factors identified by Judge Lynn in support of her ruling were that (i) two Supreme Court opinions "generally support" the proposition that the Convention "pre-empts inconsistent methods of service" wherever it applies; (ii) an Article 10 objection "most likely includes attempted service by email," and (iii) the structure of the Hague Convention itself prohibits email or other forms of service because to rule otherwise "would bypass the means of service set forth in the Convention."

*See Prem Sales, LLC v. Guangdong Chigo Heating & Ventilation Equip. Co., Ltd*., 494 F. Supp. 3d 404, 412-418 (N.D. Tex. 2020).[3]

Finally, actual notice of the Complaint, which is always feature of any motion made under Rule 12(b)(4) or Rule 12(b)(5), is insufficient under the Hague Convention. *See Schlunk*, 108 S. Ct. at 2104 (holding that the Hague Convention preempts other inconsistent methods of service). None of the "actual notice" cases cited by PetroChina which excused formal service of process involved a foreign defendant or the Hague Convention, and are thus inapposite. *See* Response at 22. As matters currently stand, the court simply cannot exercise jurisdiction over this case without evidence of a conforming proof of service under Rule 4(l) and Article 6 of the Hague Convention.

### BCI Did Not Consent to this Court's Jurisdiction

In its motion to dismiss, BCI established that the parties' binding contract in this case called for the application of New York law and the arbitration of disputes in New York. PetroChina attempts to circumvent the parties' agreement by relying on an a so-called "Long-Form Contract" which it delivered to BCI two weeks after an agreement had already been reached, and which it claims incorporates terms and conditions requiring the litigation of disputes in Texas courts under Texas law. However, as described by PetroChina's own witness, Rhonda Dempsey, on January 24, 2020, PetroChina "reached out to BCI with an offer to sell ethanol. The offer included the amount of ethanol (10,000 CBM), the price, and the approximate delivery date. At the bottom of the email offer, it states 'NY law to apply with arbitration.' Immediately thereafter, it provides that the 'Valero GTC' also apply. BCI promptly and simply responded to the offer stating 'Bci agree.'"

---

[3] The two cited Supreme Court cases by *Prem Sales* are *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1515 (2017) and *Schlunk*, 108 S. Ct. at 2104. *Prem Sales* also noted support for its holding from several sister courts in other jurisdictions and distinguished several cases holding to the contrary. *See Prem Sales*, 494 F. Supp. at 414-15.

Dempsey Decl. (Dkt. # 24-1) ¶ 8. The email transmittal of terms from PetroChina being referred to by Dempsey makes clear that PetroChina made a firm offer which expressly invited acceptance: "On behalf of PCIA, glad to **conclude** this new business between our companies. Please **revert with your acceptance**." Email from Coppola to Menezes of 01-24-2020, attached as Ex. D to Menezes Decl. (Dkt. # 17-1) (emphasis added). BCI, via a return email later that day, unconditionally accepted PetroChina's offer with the words "Bci agree." *Id*.

Under the UCC, the conduct above operated to form a contract for the sale of goods.[4] Section 2-202 of the Code, Parol or Extrinsic Evidence, provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (1) by course of performance, course of dealing, or usage of trade (Section 1-303); and
> (2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The emails exchanged between PetroChina and BCI formed a contract via a firm offer and an acceptance, both of which were in writing. The transmitting email invited an "acceptance" so that the parties could "conclude" their transaction. The expressed intent, therefore, was confirm a final expression of their agreement. BCI delivered its written acceptance later that day without modification or counter. Under Section 2-202, a contract was formed, and the contract required arbitration under New York law.

---

[4] BCI contends that New York law applies, per the facts stated above. PetroChina contends that a subsequent writing referred to as its "Long Form Contract" selects Texas law. Insofar as the terms of the UCC are concerned, the distinction is immaterial because both jurisdictions have adopted the same Subchapter B of Article 2 of the Code, namely the provisions in Sections 2-201 through 2-210.

PetroChina's response argues that the court should ignore the parties' choice of New York law and arbitration because of a later-delivered "Long Form Contract," which incorporates a third parties' general terms and conditions, and which in turn select Texas law and a Texas court forum. According to PetroChina, a long-established course of dealing existed where PetroChina's Long-Form Contracts were meant to govern, and BCI did not object to any contradictory terms in the Long-Form Contract. PetroChina's arguments, however, are directly at odds with the UCC and basic contract formation principles.

First, PetroChina's reliance on a course of dealing theory based on terms in the Long-Form Contract is not permitted under Section 2-202 of the Code.  PetroChina is not using terms of the Long-Form Contract to "explain or supplement" the agreement already reached on January 24, 2020.  Instead, PetroChina is improperly attempting to substitute the January 24, 2020 agreement to arbitrate with a new choice of law and a new choice of forum entirely. While Section 2-202 does permit "explanation or supplementation" of the basic agreed-upon terms with parol or extrinsic evidence, the Code plainly does ***not*** permit such evidence if it contradicts the already agreed-upon terms.

Second, the alleged course of dealing, even if it were somehow to apply, proves that the parties' prior custom was always to select arbitration under New York law. The parties understood that by including the terms "NY law to apply with arbitration" to their agreements, they intended that any controversy or claim related to or arising under their contract would be interpreted and construed in accordance with the laws of New York, and that disputes would be referred to arbitration in Manhattan, New York, pursuant to the rules promulgated by the American Arbitration Association. See, Motion (Dkt. # 17) at 5. BCI provides a recent example of one such agreement from April 2019, and its witness Menezes states unequivocally that "previous Deal

Confirmations for the purchase of anhydrous ethanol similarly included an agreement to arbitrate and specified that New York law would apply," and that "no previous Deal Confirmation or Long-Form Contract conferred jurisdiction and/or venue in Texas or stated that Texas law was to apply." Menezes Decl. at ¶¶ 17-18, 37 & Ex. C. PetroChina's response entirely ignores this evidence and fails to rebut it. Under the Code, "the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable consistent with each other," and "if such a construction is unreasonable, express terms prevail." UCC § 1.202(e). The parties' prior dealings, if they prove anything, prove that the parties always chose arbitration under New York law before the American Arbitration Association.

Properly analyzed, PetroChina's Long-Form Contract, delivered two weeks after the contract at issue in this case already was formed, should be considered nothing more than additional proposed terms under UCC Section 2-207(b). As between merchants, "additional terms become part of the contract *unless*" any one of three conditions apply: "(1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Substituting an entirely new choice of forum and law is clearly a proposal for a material alteration to the contract and therefore cannot become part of the parties' contract unless BCI expressly agreed to the new term. This conclusion is confirmed under both New York and Texas case law.

For example, in *Hugo Boss Fashions, Inc. v. Sam's European Tailoring, Inc.*, Hugo Boss, a New York wholesaler, agreed to sell men's clothing to Sam's European Tailoring, Inc., a California retailer. After the parties had already come to terms, Hugo Boss delivered invoices which purported to require the parties to resolve any disputes in New York and waive a jury trial.

Hugo Boss argued that 2-702(b) required the new forum-selection agreement to become a part of the contract between the parties because "such terms do not materially alter" the parties' existing contract. The court rejected that argument, expressly holding that forum-selection clauses are material under the Code: "Accordingly, defendant cannot be deemed to have agreed to New York jurisdiction, and the action was properly dismissed for lack of jurisdiction." *Hugo Boss Fashions, Inc. v. Sam's European Tailoring, Inc.*, 293 A.D.2d 296, 297, 742 N.Y.S.2d 1, 2 (2002).

Similarly, in *Tubelite v. Risica & Sons, Inc.*, a Texas Supreme Court case, Tubelite sent a firm written offer to Risica & Sons, which they unconditionally accepted. Afterwards, Tubelite sent an "acknowledgment" which stated that "acceptance hereof is expressly limited to acceptance of the terms and conditions appearing on the front and reverse side hereto." A dispute ensued in which Tubelite attempted to enforce terms contained only in the subsequent acknowledgement, not the original offer that has already been accepted. The court rejected Tubelite's claims because the "contract between the parties was formed at the time Risica accepted Tubelite's offer and consisted only of those terms contained in Tubelite's [original offer]." The court reasoned: "Section 2.207 applies only when the acceptance contains different or additional terms. Risica's acceptance contained no such terms. Here, the seller made a firm offer expressly limited to the terms contained in the offer, and after unconditional acceptance by the buyer, sought to add additional terms in shipping documents. Such additional terms contained in forms transmitted subsequent to contract formation do not become a part of the contract under section 2.207." *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 804 (Tex. 1991).

In this case, the same result should be reached as in *Hugo Boss* and *Tubelite*. BCI and PetroChina came to terms via their email exchange of January 24, 2020. Terms of the Long-Form Contract which PetroChina subsequently delivered, as in *Tubelite*, do not become part of the

parties' agreement because that agreement had already been formed upon BCI's earlier unconditional acceptance of PetroChina's firm offer. And as held in *Hugo Boss*, a proposed new forum selection agreement is a material change, and thus should be treated as nothing more than a proposal under Section 2-207.

Finally, PetroChina's reliance on this court's opinion in *Den Norske Stats Oljeselskap v. Hydrocarbon Processing, Inc.* and on the Texas Supreme Court case *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises* is misplaced. *Den Norske Stats Oljeselskap* involved a brokered transaction where the broker confirmed terms of the deal independently with the buyer and the seller and then delivered confirmatory faxes to them. Afterwards, the buyer contended that it did not consent to the agreement. The court properly analyzed the transaction as a straightforward offer and acceptance and ruled that the "merchant's exception" under Section 2.201(a) of the Code applied because the broker was acting as an authorized agent of both the buyer and the seller.[5] *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 916 (S.D. Tex. 1998), *aff'd sub nom. Den Norske Stats Oljeselskap v. Hydrocarbon Processing, Inc.*, 161 F.3d 8 (5th Cir. 1998). In this case, contract formation occurred under the Code via the January 24, 2020 email exchanges between the parties themselves. PetroChina's delivery of the Long-Form Contract two weeks later, which was never discussed between the parties, is simply not part of the agreed terms.

---

[5] Section 2.201(a) provides: "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." Tex. Bus. & Com. Code Ann. § 2.201.

*Preston Farm & Ranch Supply* concerned a series of invoices on an open account which contained a statement that interest charges would be applied to late payments. The court held that the buyer was charged with notice of the seller's intent to charge interest, and that the continued purchases after receiving notice in prior invoices constituted an acceptance of the interest charges: "The provisions imposing a service charge served only to propose to Vanderhoof the terms upon which credit would be extended. By his conduct in making continued purchases and payments, Vanderhoof accepted this proposal." *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 300 (Tex. 1981). In this case, nothing in BCI's conduct ever indicated acceptance of the Texas forum selection clause. Undeterred, PetroChina suggests that subsequent discharge instructions issued by BCI somehow confirmed that BCI was performing under the Long-Form Contract. *See* Response (Dkt. # 24) at 14, Coppola Decl. (Dkt. # 24-2) at ¶ 5 (asserting that BCI performed the Long-Form Contract by sending "discharge instructions for the delivery of the subject ethanol" on March 20, 2020.) However, the original January 24, 2020 agreement already contained a specific term concerning discharge construction: "DISCHARGE INSTRUCTIONS TO BE PROVIDED NO LATER THAN ONE (01) BUSINESS DAY AFTER REQUESTED BY SELLER." Ex. D. to Menezes Decl. (Dkt. # 17-1) at 2 (Comments Section). BCI's provision of discharge instructions is therefore referrable to the parties' January 24, 2020 agreement, not any term contained in Petro-China's Long-Form Contract.

Under the applicable Code provisions and law, the parties' formed their contract on January 24, 2020. Any terms in the Long-Form Contract delivered two weeks later which materially alter the deal, including any changes to the agreed selection of a New York law arbitration to resolve disputes, are not part of the parties' binding agreement.

**BCI Lacks Minimum Contacts with Texas**

The primary support for PetroChina's jurisdictional argument is that BCI consented to the Texas forum under the Long-Form Contract. *See* Response at 16 (Relying on *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013)). As shown above, BCI never agreed to the Texas forum.  PetroChina's assertion that this court has jurisdiction must now stand or fall on BCI's own jurisdictional contacts with Texas. However, as noted in BCI's motion, merely contracting with a Texas entity, even repeatedly, cannot confer personal jurisdiction over BCI. *See* BCI's Motion to Dismiss (Dkt. # 17) at 12-13. PetroChina presses on by arguing that most of the shipments between the parties in the past, including the one in dispute here, originated from Texas ports. However, for jurisdictional purposes, the court may only assess BCI's contacts with the forum state itself. *See id.* at 11. BCI is indifferent concerning the source of the goods being purchased. PetroChina's decision to source the goods from Texas was solely its own; it was not a purposeful jurisdictional contact *of BCI* with Texas. And as set forth in BCI's motion, BCI took no other actions by which it might have purposely availed itself of jurisdiction in Texas. Absent a valid and enforceable forum selection clause selecting Texas courts to resolve disputes, the court clearly lacks personal jurisdiction over BCI.

**PetroChina's Claims Should be Arbitrated in New York**

As noted in BCI's Motion, established law interpreting the Federal Arbitration Act (the "FAA" or the "Act") requires the court to resolve all doubts concerning arbitrability in favor of arbitration. BCI's Motion (Dkt. # 17) at 15-16. PetroChina's response does not contest this established precedent, but instead points to a dictionary definition of maritime contracts to argue that the FAA is inapplicable. However, the Act itself contains its own jurisdictional grant in Section 1:

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

9 U.S.C.A. § 1. Under this grant, maritime transactions are expressly defined to include "any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction." The grant then extends to all "commerce among the several States or with foreign nations." The Supreme Court has repeatedly confirmed that the reach of the FAA coincides with the expansive reach of the Commerce Clause. *See, e.g., Allied-Bruce Terminix Companies, Inc. v. Dobson*, 115 S. Ct. 834, 840 (1995) (describing the Act's reach "expansively as coinciding with that of the Commerce Clause."); *Perry v. Thomas*, 107 S. Ct. 2520, 2525–26, (1987) (the Act "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause"); *Southland Corp. v. Keating*, 104 S. Ct. 852, 860 (1984) (the "involving commerce" requirement is a constitutionally "necessary qualification" on the Act's reach, marking its permissible outer limit); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 87 S. Ct., at 1807–08 (Harlan, J., concurring) (endorsing *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 407 (CA2 1959) (Congress, in enacting the FAA, "took pains to utilize as much of its power as it could")).

Clearly, the FAA applies to the parties' transaction in this case. References to general dictionary definitions cannot overcome the statute's own jurisdictional grant. Given that, at most, a dispute exists concerning whether the parties' intended "NY LAW TO APPLY WITH ARBITRATION," the court is obligated resolve the dispute in favor of arbitration by operation of

the FAA. If this court determines that it can exercise jurisdiction over BCI at this time, the court must then order that the parties arbitrate their dispute before the American Arbitration Association in New York.

### Request for Oral Argument

This case concerns a detailed factual record and involves questions concerning several bodies of law, including jurisdictional issues, compliance with a treaty, and the interpretation of technical provisions of the Uniform Commercial Code. BCI submits that oral argument would assist the court reaching a decision.  Pursuant to Local Rule 7.5A, BCI therefore requests that court set this matter for oral argument.

Respectfully submitted,

*/s/ Arthur S. Feldman*
ARTHUR S. FELDMAN, P.C.
Arthur S. Feldman
Southern District of Texas ID: 15174
TX Bar No.: 06886600
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
Telephone: 713-452-2662
Facsimile:  713-526-2708
E-mail: arthur@feldmanlawfirm.com

**ATTORNEYS FOR BCI BRASIL**
**CHINA IMPORTADORA E DISTRIBUIDORA S.A.**

### CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF System, which will furnish an electronic copy to all counsel.

*/s/ Arthur S. Feldman*
ARTHUR S. FELDMAN